1
2
3
4
5
6
7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11
12   **SAVE THE PARK AND BUILD THE SCHOOL,**                    Case No.  3:20-cv-1080-LAB-AHG

13                                              Plaintiff,      **AMENDED ORDER OF PRELIMINARY INJUNCTION**

14                 **v.**

15
16   **NATIONAL PARK SERVICE; DAVID L. BERNHARDT, in his**
17   **official capacity as Secretary of the United States Department the**
     **Interior; DAVID VELA, in his official**
18   **capacity as Director of the National Park Service; LISA MANGAT, in her**
19   **official capacity as Director of the California Department of Parks and**
20   **Recreation;** AND **CARDIFF SCHOOL DISTRICT,**
21
22                                             Defendants.

23

24          The Court held a hearing on July 20, 2020 to address Plaintiff Save the Park

25   and Build the School's ("Save the Park") Ex Parte Motion for Temporary

26   Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. 9,

27   which the Court construed as a motion for preliminary injunction.  Dkt. 10.  After

28

                                                1

hearing fully from counsel for the parties, the Court orally issued its decision granting the injunction temporarily.  This Order memorializes that ruling.

Defendant Cardiff School District (the "District") is **ENJOINED** from engaging in any construction or demolition within the original 6(f)(3) boundary of George Berkich Park, with the exception that construction of the biofiltration basins and turf may proceed consistent with the terms of the settlement agreement between Save the Park and the District, Dkt. 9-31.  This injunction will expire at 11:59 p.m. on August 31, 2020 unless renewed and may expire earlier if so ordered by the Court.

If the National Park Service ("NPS") decides, one way or the other, on reconsideration of the approval of construction prior to August 31, 2020, Save the Park and the District must promptly inform the Court.  During the hearing, the Court impressed upon NPS's counsel the urgency of NPS's reconsideration and urged NPS's counsel to relay the Court's message to the agency.  The Court now renews its request for NPS's prompt reconsideration.

Defendants have requested that the Court require the posting of a bond. Within seven days of docketing of this Order, Save the Park must show cause why a bond should not be set in the amount of $20,000.

## Background

This case involves school renovations that encroach on George Berkich Park, a park in the City of Encinitas owned by Defendant Cardiff School District.  In 1993, the District and the City of Encinitas received renovation funding for the park under the Land and Water Conservation Fund Act ("LWCFA").  That funding came with a string attached, which provides the federal hook in this case.  Section 6(f)(3) of the LWCFA requires that the park be retained for public outdoor recreation unless the Secretary of the Interior finds a proper substitution of similar recreation properties.  54 U.S.C. § 200305(f)(3).

1    The renovation intrudes on 9-14% of the land protected by Section 6(f)(3) (the
2    "6(f)(3) boundary"), replacing grassy parkland and walking path with school
3    buildings, paved parking, a pickup and drop-off area, and biofiltration basins.

4    Plaintiff, Save the Park, is a nonprofit organization comprised of people who
5    live near the park and use it for recreation.  Save the Park initially sued the School
6    District in state court contending that the District began renovating the park without
7    necessary approval from the National Park Service ("NPS").  In November 2019,
8    the state court granted a preliminary injunction putting a stop to construction in the
9    6(f)(3) boundary.  Dkt. 9-21.  The state judge also granted a petition for a writ of
10   mandate after finding that the District's Environmental Impact Report ("EIR")
11   didn't comply with the California Environmental Quality Act ("CEQA").  *Id.*

12   In February 2020, the parties settled the state court action and the state court
13   dismissed it with prejudice.  Under the settlement agreement, the District agreed not
14   to convert park land without first obtaining NPS approval.  The agreement included
15   a general waiver of claims, but Save the Park reserved the right to "use any ruling
16   issued and any evidence obtained in [the state court litigation] to challenge any
17   action taken . . . by . . . NPS in connection with [the project]."  Dkt. 9-31 ¶ 10(a).
18   For its part, the District reserved the right to "challenge the meaning, effect, or
19   significance of any rulings . . . used by [Save the Park] in such proceedings."  *Id.*

20   On April 24, 2020, NPS approved conversion of the park and construction
21   resumed.  Before filing this action, Save the Park first sought to have NPS
22   reconsider its approval.  But when it became clear that NPS's reconsideration
23   would not occur quickly, Save the Park filed this lawsuit on June 12, 2020 seeking
24   to halt construction activities in the now-demolished park.  In addition to the School
25   District, Save the Park named as defendants NPS, Secretary of the Interior David
26   Bernhardt, Director of NPS David Vela, and Director of the California Department
27   of Parks and Recreation Lisa Mangat.

28

1    Save the Park seeks a preliminary injunction enjoining the District from

2    engaging in further construction and renovation activities within the Section 6(f)(3)

3    boundary of George Berkich Park, and from denying the public access to the park

4    for outdoor recreational use.  Save the Park maintains that relief is warranted

5    because NPS's consent was not "properly-granted [n]or fully reasoned."

6                    **Save the Park Is Entitled to a Preliminary Injunction**

7    To prevail on an application for a preliminary injunction, a plaintiff must

8    establish:  (1) that he is likely to succeed on the merits; (2) that he is likely to suffer

9    irreparable harm in the absence of preliminary relief; (3) that the balance of the

10   equities tips in his favor, and (4) that an injunction is in the public interest.  *A*

11   *Woman's Friend Pregnancy Resource Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th

12   Cir. 2018).  An injunction shouldn't issue unless the plaintiff makes a showing "*on*

13   *all four prongs*."  *Id.*  Save the Park has made the required showing.

14                         a.  Likelihood of Success on the Merits

15   Save the Park argues that NPS's approval of the Project should be set aside.

16   Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq., agency

17   action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or

18   otherwise not in accordance with the law," "without observance of procedure

19   required by law," or "unwarranted by the facts to the extent that the facts are

20   subject to trial de novo by the reviewing court."  5 U.S.C. § 706(2).  Without

21   making a final determination of this issue, the Court finds that Save the Park is

22   likely to be able to show that NPS's initial, hasty approval of the project was

23   arbitrary, capricious, and an abuse of discretion.

24   Section 6(f)(3) of LWCFA "assures that once an area has been funded with

25   [LWCF] assistance, it is continually maintained in public recreation use unless NPS

26   approves substitution property of reasonably equivalent usefulness and location and

27   of at least equal fair market value."  36 CFR § 59.3(a).  That section's

28

implementing regulations preclude NPS from considering a conversion application unless, among other requirements:

1) The applicant has proposed replacement property that meets recreation needs "at least like in magnitude and impact to the user community as the converted site," 36 C.F.R. § 59.3(b)(3)(i);

2) The proposed replacement property "has not been dedicated or managed for recreational purposes while in public ownership," 36 C.F.R. § 59.3(b)(4)(ii); and

3) "The guidelines for environmental evaluation have been satisfactorily completed and considered by NPS," 36 C.F.R. § 59.3(b)(7).

Save the Park likely will succeed in showing that NPS failed to properly heed these requirements.

*Provision of Comparable Replacement Property*

The Court specifically finds that Save the Park is likely to succeed in showing that NPS failed to properly consider whether the replacement property the District offered meets the criteria in the NPS regulations.  The District's proposed replacement property consists neither of land that "has not been dedicated or managed for recreational purposes while in public ownership" or of land that "meet[s] recreation needs . . . at least like in magnitude and impact to the user community as the converted site."  36 C.F.R. § 59.3(b)(4)(ii); 36 C.F.R. § 59.3(b)(3)(i).

The replacement property consists partially of hardcourts that the District and the City of Encinitas agreed, via a 1994 amendment to a Joint Use Agreement, would be "available for general public recreational use . . . in perpetuity."  Under the plain language of 36 C.F.R. § 59.3(b)(4)(ii), the hardcourt property "has . . . been dedicated or managed for recreational purposes while in public ownership," and that past designation renders it *ineligible* for use as replacement property.  Although the District sought to revoke the designation in December 2019 after it

5

1  became clear that it needed more land to support the conversion, Dkt. 13 at 22;

2  Dkt. 9-33 at 3 (discussing rejection of prior proposal in part due to NPS concerns

3  about "recreational utility" of that proposal), that action can't erase the past – the

4  hardcourts *had previously been dedicated for recreational use while under public*

5  *ownership*.  The District's apparent attempt to circumvent the regulation by closing

6  recreational space to the public so it could immediately offer it up again as

7  replacement property was ineffective and ultimately futile.

8        Another section of the purported replacement property—comprising nearly

9  five-eighths of the total asserted area—is a parking lot.  When an applicant

10 proposes to convert property, it must "evaluate [that property] in order to determine

11 what recreation needs" the property fulfills.  36 C.F.R. 59.3(b)(3)(i).  While the

12 replacement property and the replaced property "need not provide identical

13 recreation experiences," 36 C.F.R. 59.3(b)(3), the applicant must "evaluate[]

14 [proposed replacement property] in a similar manner to determine if it will meet

15 recreation needs which are at least like in magnitude and impact . . . as the

16 converted site."  *Id.*  Here, the proposed parking lot will not replace another parking

17 lot, other support facilities, or any other property that fulfills needs similar to those

18 a new parking lot will fulfill.  It instead replaces grassy parkland.  Whatever the

19 advantages of having space to park adjacent to the parkland, a parking lot simply

20 does not "meet *recreation needs*" that are "*like in magnitude and impact*" to the

21 recreational purposes served by grassy parkland.  36 C.F.R. 59.3(b)(3)(i) (emphasis

22 added).

23       Save the Park is likely to succeed on the merits of its claim that NPS approval

24 of the proposed replacement property was arbitrary and inconsistent with the

25 LWCFA regulations.

26       *Environmental Guidelines*

27       Save the Park is also likely to succeed on its claim that NPS could not rely on

28 the District's EIR to find that "[t]he guidelines for environmental evaluation have

6

been satisfactorily completed and considered."  36 C.F.R. § 59.3(b)(7).  Save the Park argues that NPS's reliance on the EIR was ill-considered in the face of a state court order granting a petition for a writ of mandate that vacated parts of the EIR and repudiated the District's prior approval of it.  *Compare* Dkt. 9-21 *with* Dkt. 13-9 at 65-66.  In response the District argues that the state litigation settlement bars Save the Park from arguing that the EIR violated CEQA.  Dkt. 13 at 22-24.  While this may be, it's beside the point.  The settlement agreement's general release of claims is limited by a specific carve-out of "challenge[s] [to] any action taken . . . by . . . NPS in connection with" the Project.  Dkt. 9-31 ¶ 10(a).  Saves the Park's contention that NPS relied on faulty environmental impact data poses such a challenge.

*Rice v. Crow,* 81 Cal. App. 4th 725 (2000) isn't to the contrary.  The District relies on *Rice* to argue that the voluntary dismissal of Save the Park's state litigation claims—as opposed to the terms of the settlement agreement—estops them from "pursuing *any* claim *alleging* that the District's EIR violates CEQA." Dkt. 13 at 23 (emphasis added).  In other words, the District seeks to invoke collateral estoppel.  *See Rice,* 81 Cal. App. 4th at 735 ("Collateral estoppel . . . bar[s] relitigation of *issues*," not claims) (emphasis in original).  Yet *Rice* itself forecloses applying collateral estoppel when an action is dismissed pursuant to a settlement agreement: "Because the . . . action was settled and not tried, collateral estoppel does not bar litigating any issue in the underlying action."  *Compare* Dkt. 13 at 23 *with Crow*, 81 Cal. App. at 737.[1]  So too here – the parties' settlement agreement doesn't bar Save the Park from raising the issue of environmental compliance in opposition to NPS's approval.

---

[1] The District's citations to *Federal Home Loan Bank of San Francisco v. Countrywide Financial Corp.*, 214 Cal. App. 4th 1520, 1529 and *Boeken v. Philip Morris USA, Inc.*, 248 Cal. 4th 788 (2010), are no more helpful.  Those cases involve *res judicata*, not collateral estoppel.  *Countrywide*, 214 Cal. App. 4th at 1529; *Boeken*, 284 Cal. 4th at 797.

The District makes an alternative argument:  Because there was no "ongoing controversy" or litigation when NPS approved the project, the project doesn't "[h]ave highly controversial environmental effects" that precludes application of a categorical exclusion.  Dkt. 13 at 24; Dkt. 9-33 at 5; 43 C.F.R. § 46.215.  This argument likewise isn't persuasive.  The parties' settlement ended the state litigation and released rights to legal relief under CEQA.  But it didn't end the controversy over the environmental impact.  *See, e.g., Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (finding existence of "public controversy" based on comments to proposed administrative action).  The state court found "substantial evidence that the project will have a significant effect on the environment."  Dkt. 9-21 at 4 (internal marks removed).  And the parties' settlement agreement – in particular, the carve out of preserved issues – made clear that although the agreement resolved the state court litigation it did *not* resolve the environmental issues.  Dkt. 9-31 ¶ 10(a).  The *environmental effects* of the project remain controversial, regardless of the settlement of the CEQA-compliance claims.

Save the Park is likely to succeed on the merits of this argument.

b.  Irreparable Harm in the Absence of Preliminary Relief

Both sides appear to agree that injury resulting from violation of the LWCFA are environmental in nature and, as such, typically can't be adequately remedied by money damages.  *See* Dkt. 9-1 at 28; Dkt. 13 at 25.  But the District disputes whether issuing a preliminary injunction at this point accomplish its objective – preventing further harm.  Dkt. 13 at 25.  The District reasons that because it has already demolished "the entirety of George Berkich Park," an injunction will simply render the land "unusable for any recreational purposes whatsoever."  *Id.*

But this presupposes that the District or the City of Encinitas will not rebuild the Park – and that they cannot be required to do so.  In fact, part of the relief Save the Park is seeking is to require the Park be rebuilt.  *See* Complaint, Dkt. 1 at 46-47.

8

1    Permitting further construction at this point within the 6(f)(3) boundary would

2    render any later amelioration of the park more difficult and expensive.

3          The District relies on *Weiss v. Secretary of U.S. Dept. of Interior*, 459 Fed.

4    Appx. 497 (6th Cir. 2012), an unpublished decision from another jurisdiction, to

5    argue that the Court cannot stop construction that is already underway.  But *Weiss*

6    is distinguishable.  The plaintiff in *Weiss* sought to halt a development project that,

7    at the time of the court action, was "largely finished."  *Id.* at 500.  The golf course

8    at issue was "constructed and open," and new parkland "ha[d] been completely, or

9    almost completely, improved."  *Id.*  There was no further potential for irreparable

10   harm because the harm had already occurred.

11         Here, in contrast, the project is neither complete nor nearly so.  Although the

12   parkland has been demolished, no structures have been built in the old 6(f)(3)

13   boundary. Save the Park's claims are not mooted by the demolition, since plaintiffs

14   ultimately seek rebuilding of the demolished park land, *see, e.g., Northwest*

15   *Environmental Defense Center v. Bonneville Power Admin.*, 477 F.3d 668, 680-81

16   (9th Cir. 2007) (courts conducting APA review have "broad [equitable] powers to

17   order mandatory affirmative relief"), and the Court's equitable powers surely

18   permit it to order such relief.

19         The Court finds that Save the Park would suffer irreparable harm in the

20   absence of preliminary relief.

21                   c.     The Balance of the Equities Favors Save the Park

22         Save the Park has also carried its burden to show that the balance of the

23   equities favors issuance of an injunction.  On Save the Park's side of the scale is the

24   potential environmental harm that LWCFA is designed to protect.  Counterbalanced

25   against the environmental concerns is the economic harm the District will suffer

26   from construction delays.[2]  But economic harm does not generally outweigh the

27   _____

28   [2] In any event, changed circumstances between when the District filed its brief and
     the date of the hearing suggest that a time-limited injunction is unlikely to interfere
     with the District's ability to open school on time.

environmental harms protected by LWCFA.  As a general rule, "the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs [are] likely to succeed on the merits of their underlying claim."  *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled on other grounds as stated in American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir.2009).  Because the Court finds that Save the Park is likely to succeed on the merits, the prospect of environmental harm prevails and tips the balancing process in favor of issuance of an injunction.

*Alleged Lack of Diligence*

The District also opposes an injunction because, it contends, Save the Park was not diligent in seeking relief.  Construction of the project restarted in late April 2020, according to the District, but Save the Park didn't file this suit until June 12, 2020, and it did not seek a temporary restraining order or preliminary injunction until June 26, 2020.  Dkt. 13 at 28-29.  But seeking injunctive relief is not the only means of diligently addressing a matter.  A prompt challenge may take the form of asking NPS to reconsider.

The District relies on *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989), for the proposition that parties seeking relief from an administrative decision concerning public construction projects must act "with haste and dispatch."  In *Quince*, the plaintiffs made no "challenge [to] the legal sufficiency" of NPS's approval for *nine months* following issuance of the approval.  *Id.* at 78, 80.

Here, in contrast to *Quince*, Save the Park acted "with haste and dispatch" by promptly challenging NPS's approval of the project with the agency.  Within a month of NPS's issuing its initial approval, Save the Park prepared and served on NPS a voluminous petition requesting reconsideration. Dkt. 17-1 ¶ 8.  Although there was delay following Save the Park's submission, it was occasioned by NPS's

10

1   assurances that it would consider the submitted material and issue "updates" within
2   two weeks.  All the while, counsel for Save the Park continued to press NPS to
3   move quickly. Dkt. 17-2 at 14-18.  When it became clear that NPS's updates would
4   not take the form of a decision – and still less than two months after NPS issued its
5   initial approval – Save the Park filed this action. *Compare* Dkt. 17-2 at 14 (June 11,
6   2020 email from NPS promising "another update in two weeks") *with* Dkt. 1, 9
7   (complaint filed June 12, 2020 and application for temporary restraining order filed
8   June 26, 2020).

9        The Court finds Save the Park's early and continuous communication with
10  NPS seeking reconsideration of the agency's decision, along with its prompt filing
11  of this lawsuit once it realized that NPS wouldn't reach a quick decision,
12  sufficiently establish Save the Park's diligence in challenging NPS's approval.

13        The balance of the equities favors Save the Park.

14                    d.  The Public Interest Favors a Time-Limited Injunction

15        Save the Park succeeds, too, in showing that the public interest favors
16  injunctive relief – if only temporarily.  Save the Park rightly notes that the public
17  has an interest in ensuring that public agencies comply with their own regulations.
18  However, this interest would normally be outweighed by the competing interest in
19  ensuring that school is open and ready for use by students when the school year
20  begins.  But there's a twist this year:  The California Department of Public Health
21  and California Governor Newsom announced on July 17, 2020 that certain schools
22  will not open in California counties that have been on the COVID-19 Monitoring
23  List.[3]  San Diego County is one of those, and schools in the Cardiff District are
24  therefore not scheduled to open on time this year.  It's unlikely at this point that the
25

---

26  [3] The Court takes judicial notice of the California Department of Public Health's
27  Guidance, available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/
    Guidance.aspx, and Governor Newsom's announced action in connection with that
28  guidance, available at https://www.gov.ca.gov/2020/07/17/governor-gavin-
    newsom-lays-out-pandemic-plan-for-learning-and-safe-schools/.

1  District will need to be ready to accommodate students in classrooms in

2  September—or for that matter in the immediate future.

3       A further consideration supports a time-limited injunction.  NPS's counsel

4  estimated at the hearing that the agency may complete its reconsideration around

5  the end of August.  A reversal or modification of NPS's decision would

6  substantially alter the likely outcome of this lawsuit, potentially clarifying whether

7  an injunction for a longer term would be appropriate.  The relatively brief time

8  necessary to wait for NPS to reach a decision supports issuance of time-limited

9  injunctive relief.

10      Considering the slim likelihood that schools in San Diego County will be open

11 for in-person learning in the fall and the high likelihood that further NPS action will

12 clarify the issues in the next several weeks, the Court finds that the public interest

13 favors issuance of an injunction, if only temporarily.

14             **The Record Does Not Support Waiving the Bond Requirement**

15      The Court has wide discretion in setting security for a preliminary injunction.

16 *See Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319,

17 1326 (9th Cir. 1985) (affirming trial court's exercise of discretion to dispense with

18 security requirement).  Contrary to the District's contention, the Court need not set

19 a bond that "approximate[s] actual damages."  *Save our Sonoran, Inc. v. Flowers*,

20 408 F.3d 1113, 1126 (9th Cir. 2005).  Instead, "requiring nominal bonds is perfectly

21 proper in public interest litigation."  *Id.*  But the Court must carefully consider the

22 relative hardships in arriving at an appropriate bond amount.  *Id.*  Here, Save the

23 Park has offered no information regarding its financial situation.[4]

24 / / /

25 / / /

26 _____

27 [4] The District also suggests that the Court should inquire into the finances of Save
   the Park's members.  But the Court can't treat Save the Park and its members as an
   indivisible financial unit.  *See* Cal. Corp. Code § 18605 (members of

28 unincorporated nonprofit association not liable for association's debts).

The Court orders Save the Park to show cause, no later than seven days after issuance of this order, why bond should not be set at $20,000.

Dated: July 24, 2020

The Honorable Larry A. Burns
Chief United States District Judge